THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
VICTOR BERRY, Appellant.

First Department, May 27, 1982

APPEARANCES OF COUNSEL

*Ronald J. Veneziano* of counsel (*Marino & Veneziano,*
attorneys), for appellant.

*James Patton* of counsel (*Bruce Allen* with him on the
brief; *Robert M. Morgenthau, District Attorney,* attorney),
for respondent.

### OPINION OF THE COURT

BLOOM, J.

On October 10, 1979, Sergeant (now Lieutenant) Finkelstein was supervising the Special Narcotics Enforcement Unit in the 32nd Precinct. During the early afternoon of that day, he, Detective D'Ercole and Police Officer Libretto, all in uniform, were touring the precinct in a marked police car. At about 2:00 P.M. they approached the vicinity of Seventh Avenue between 143rd and 144th Streets. At that time Finkelstein saw the defendant at "144th Street and Seventh Avenue, on the east side of Seventh Avenue". In Finkelstein's words, the following occurred:

54

"A. (Continuing.) And, knowing the individual from prior occasions, I called to him.

"Q. All right. Never mind.

"A. I called to him and I informed him that I wanted to speak with him, could he come over to the radio car. The defendant took a few steps towards the car, but he stopped about 10 or 15 feet away from the radio car. I said 'Victor, I just want to talk to you. I'm not going to do anything. I just want to speak with you. Come over'. And he said, 'No that's as close as I'm gonna go.' So, I just — my suspicions were a little aroused. I opened the car door and started to get out of the radio car, when Victor proceeded to run. He ran across Seventh Avenue and south towards 143rd Street and myself and Detective D'Ercole began pursuing him on foot. When he reached 143rd Street, he turned in a westerly direction and ran towards 143rd Street, westerly towards Eighth Avenue. On the block between Seventh and Eighth, on 143rd Street, there's a schoolyard on the north side of the street and Victor * * * was ahead of me and D'Ercole was also ahead of me, behind and pursuing Mr. Berry, and I observed Victor reaching in the front of his waistband area and throwing something, an object, to his right, and continued to run. I continued to pursue and D'Ercole went for the object. When D'Ercole — there was another individual near where the object landed, an older gentleman who picked it up * * * and he handed it to D'Ercole and D'Ercole yelled to me, 'It's a gun.' At that point, I turned around and ran back towards where the radio car was to further pursue Victor Berry, who had run through the school yard and out onto 144th Street. The school yard goes through the block.

"Q. Lieutenant, did you apprehend the defendant at that time?

"A. No, we did not.

"Q. You mentioned that you knew the defendant from prior experience. Would you tell us what you mean by that?

"A. Well, my team, the Special Narcotics Enforcement Unit in the 32nd Precinct —

"MR. VENEZIANO [defense counsel]: Excuse me, your Honor. Even though standards are somewhat more relaxed on a motion to suppress with regard to hearsay, this is a little different and I don't think its appropriate. I would object to it.

"THE COURT: Overruled.

"MR. VENEZIANO: Respectfully except.

"A. The unit that I was supervising had arrested the defendant several times prior and he was known to us as a drug dealer in the vicinity * * *

"A. (Continuing.) I also had contact with Victor in the street on several occasions; just conversations like the one I was attempting to engage in on that particular day".

Defendant was thereafter arrested and charged with two counts of criminal possession of a weapon in the third degree. He moved to suppress the weapon, contending that it came into possession of the police as the result of an unlawful seizure. The testimony of Finkelstein which is set forth above was given at the hearing. Additionally, he testified that the area was known to be an area of heavy drug trafficking; that there had been much community pressure to clear the area of possible traffickers and that he had been under instructions from Inspector Vincent, the Commanding Officer of the 32nd Precinct to "keep the block as clear as possible". The conversation initiated by Finkelstein with defendant was to inform him that if he did not "live on the block, he should stay away from the area because it was just a hot location and we were going to be giving it a whole lot of attention".

D'Ercole also testified at the hearing. His testimony substantiated that given by Finkelstein adding to it only the fact that during the chase neither of the officers had drawn his weapon. Defendant did not testify, nor did anyone on his behalf.

The suppression motion was denied. The hearing court found the police officers to be "frank, candid and trustworthy" and his findings paralleled their testimony.

Defendant thereafter pleaded guilty to one count of attempted criminal possession of a weapon in the third degree. The sole issue tendered on this appeal is whether

the motion to suppress was correctly decided. We believe that it was. Accordingly, we would affirm.

Our dissenting brethren treat this as an arrest made without probable cause, thus mandating suppression of the gun. They fail to note the distinction between an arrest and a seizure incident to a street encounter (*People v Stewart,* 41 NY2d 65; *People v De Bour,* 40 NY2d 210; *People v Rosemond,* 26 NY2d 101). In the case of the former there must be a full blown demonstration of probable cause; and where "the record is barren of any objective evidence evincing criminal activity" (*People v Cantor,* 36 NY2d 106, 113), physical evidence seized must be suppressed. Where, however, the encounter is initiated by activity occurring on the street, the touchstone becomes the reasonableness of the police activity. "[W]hether or not a particular search or seizure is to be considered reasonable requires a weighing of the government's interest against the encroachment involved with respect to an individual's right to privacy and personal security" (*People v De Bour, supra,* p 215). This entails an evaluation of two discrete but interrelated elements: "first whether or not the police action was justified in its inception and secondly whether or not that action was reasonably related in scope to the circumstances which rendered its initiation permissible" (*People v De Bour, supra,* p 215; see, also, *Brown v Texas,* 443 US 47, 51). While these factors require consideration of the kaleidoscopic street scene, essentially they are "gradations of the probable cause standard" and the propriety of police action is to be judged by whether the predicate for that action is "objective and susceptible of articulation" (*People v Stewart,* 41 NY2d 65, 66, *supra*).

We do not dispute the conclusion implicit in the dissent that the direction by Finkelstein to defendant that he wished to speak with him constituted a seizure. " ' "[w]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person" ' " (*Brown v Texas,* 443 US 47, 50, *supra,* quoting from *Terry v Ohio,* 392 US 1, 16). Thus we are required to evaluate the police conduct in the context of the circumstances which confronted the police to determine whether the police invasion of defendant's expectation of privacy

was reasonably related in scope and circumstance to the situation spelled out by the record.

To begin with, the police were cruising in an area known for its high incidence of drug trafficking. They observed defendant standing in the area. Defendant was known to the police as a seller of drugs. Indeed, the members of Finkelstein's team had arrested him on prior occasions for that reason. Finkelstein had been instructed by his commanding officer to rid the area of drug traffickers. In compliance with his orders Finkelstein ordered the police vehicle to stop and called to defendant so that he might ascertain his address and instruct him to leave the area in the event that he did not reside in it. Up to this point there is no claim that the action of the police was excessive or that it constituted an arbitrary invasion of defendant's right of privacy. Indeed, there can be no such claim for the intrusion was minimal and was warranted even though at that point there was no indication of criminal activity (*People v De Bour, supra,* p 223; *People v Moore,* 62 AD2d 155, revd on dissenting opn of SILVERMAN, J., 47 NY2d 911). Everything which followed — Finkelstein's exiting the police vehicle, defendant's flight — a highly relevant circumstance in the context of the fact pattern here presented (*People v Kreichman,* 37 NY2d 693) — the chase and defendant's throwing of the object which turned out to be a gun, flowed from defendant's refusal to accede to a reasonable police request. In these circumstances, we do not believe that the weapon should have been suppressed.

Defendant, and the dissenters, rely in the main upon *People v Howard* (50 NY2d 583) to support their conclusion that the seizure was improper. At first blush, the two cases appear to have the same superficial gloss. Upon closer analysis, however, the similarity fades. In *Howard,* the defendant was unknown to the police. The sole "articulable" basis for the chase was the claim that defendant was carrying a woman's vanity case and looked "furtively" at the police. While it may be somewhat strange in our society for a man to carry a woman's vanity case, that fact is scarcely indicative of the suspicious conduct necessary to initiate an interrogation by the police. This contrasts sharply with the instant case which includes police knowl-

edge of defendant's prior criminal behavior and his presence in the general area where that past criminal activity had been conducted. Rather, we think that the situation here presented is governed by *People v Boodle* (47 NY2d 398). In that case the police were informed that the defendant might be possessed of information concerning a homicide then under investigation. Accordingly, they seized him for the purpose of taking him to the precinct station for interrogation. In the words of Judge WACHTLER, he "did nothing to arouse even the slightest suspicion" (47 NY2d, at pp 400-401). As the two police officers began to drive defendant to the precinct he was instructed to keep his hands where they could be seen. En route, one of the officers, observing defendant through the rear view mirror, saw him throw a black object out of the window, an object which the officer immediately recognized as a gun. The vehicle was stopped, the gun retrieved and the defendant charged with its possession. In holding that suppression had properly been denied the court said that "the weapon was produced and thrown to the street by the defendant himself" (p 402). It further noted "that defendant, in seeking to rid himself of the weapon, did not respond directly to the illegal police action * * * Rather than a spontaneous reaction to a sudden and unexpected confrontation with the police, the defendant's attempt to discard the revolver was an independent act involving a calculated risk" (p 404). Here, too, the initial unexpected confrontation with the police did not result in any endeavor by defendant to rid himself of the weapon. His flight was a calculated act by which he sought to obtain time so that the gun could be discarded. In sum, the situation described in *Boodle* is precisely the situation which here obtained.

Accordingly, the judgment of the Supreme Court, New York County (BECKER, J., at suppression hearing and plea) rendered on December 16, 1980, convicting defendant of attempted criminal possession of a weapon in the third degree, should be affirmed.

CARRO, J. (dissenting). "An individual to whom a police officer addresses a question has a constitutional right not to respond. He may remain silent or walk or run away. His refusal to answer is not a crime. Though the police officer

may endeavor to complete the interrogation, he may not pursue, absent probable cause to believe that the individual has committed, is committing, or is about to commit a crime, seize or search the individual or his possessions, even though he ran away. Nor when the individual, cornered by his pursuers in the basement of a building and while looking for a way out of the basement, drops or throws a package he was carrying into a pile of junk, has he been shown to have intentionally abandoned the package so as to make a warrantless search and seizure permissible. The order of the Appellate Division should, therefore, be reversed, the motion to suppress should be granted and the indictment should be dismissed" (*People v Howard,* 50 NY2d 583, 586). "*Howard* precludes the seizure of evidence acquired during the course of an unwarranted chase". (*People v Glover,* 82 AD2d 43, 46.)

Three uniformed police officers in a marked police vehicle observed defendant Berry standing on 7th Avenue in a "high drug area". The defendant was known to have been arrested several times for drug violations and, because of community pressure, officers had been instructed to keep that particular block clear of drug trafficking.

"There was nothing about his demeanor that would arouse suspicion, that he was or had been engaging in any criminal activity or conduct of a suspicious nature * * * Lieutenant Finkelstein called the defendant and asked him to approach the police car. The defendant walked toward the car, stopped at a distance of 15 feet away and refused to come closer. Lieutenant Finkelstein assured Berry that he only wanted to talk with him, but the defendant still refused to comply.

"Finkelstein then emerged from the police car and the defendant, observing this, began to run * * * Both Officers Finkelstein and D'Ercole pursued the defendant * * * neither Officer drew his gun at any time.

"The defendant then ran into a schoolyard on 143rd Street. When Officer D'Ercole was within ten or fifteen feet of the defendant in the schoolyard but losing ground, both

officers observed the defendant reach into his waistband and throw an object to the ground."[1]

The object, a revolver, was retrieved, defendant's motion to suppress was denied, and he entered a plea of guilty to the attempted possession of a weapon in the third degree.

The People on this appeal maintain that "[s]imply put, defendant's precipitous act of running away gave the officers probable cause to arrest * * * they were obviously justified in running after him. And it follows *a fortiori* that they were entitled to retrieve the gun that defendant discarded during the chase — that act established probable cause beyond peradventure * * * [T]here were indicia of criminality — a known drug dealer in a drug-infested neighborhood — which, when coupled with defendant's sudden flight, constituted probable cause."

Probable cause exists where the facts and circumstances within the officer's knowledge are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed (*Brinegar v United States*, 338 US 160, 175; *Carroll v United States*, 267 US 132, 162). Probable cause presupposes grounds to arrest, i.e., that defendant is committing or has committed a crime. There were no objective circumstances pointing to the commission of a crime by defendant. Prior to his flight, the People can point to only two criteria. First, that the encounter took place in a high crime or "high drug area", and second, that defendant had been arrested "several times" prior and therefore was a suspected drug dealer. "The fact that appellant was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct. In short, the appellant's activity was no different from the activity of other pedestrians in that neighborhood." (*Brown v Texas*, 443 US 47, 52.) Nor can a prior arrest record itself lead to the conclusion that Berry was engaged in criminal activity. Nor can the combination of those two factors, the neighborhood and the defendant's prior arrest record and reputation, result in a finding of probable cause, as there are no articulable facts supporting the conclusion that a crime was committed. The People do not contend that the

---

1. Findings of fact, motion to suppress evidence.

defendant's flight in and of itself forms the basis of a finding of probable cause. But they do contend that the flight, in combination with the other two factors, makes out the requisite probable cause.

In *People v Howard* (*supra*) the police officers observed the defendant crossing the street in an area which had a high incidence of burglaries, carrying what appeared to be a woman's vanity case. Defendant looked at the officers' vehicle several times in a "furtive" manner and reversed directions. The officers drove parallel with him and one said, "Police Officer. I would like to speak to you." Defendant ignored them and continued walking. The officer repeated the same words and began to get out of the car. Defendant, without saying anything, started to run. The police, and a civilian pursued. Howard proceeded over an iron fence, through an alleyway and into the basement of a building, at which point he threw the vanity case into a pile of junk in the corner and attempted to escape from the basement. He was caught and restrained and the vanity case was retrieved from the rubbish pile, beyond defendant's reach. It contained a revolver and heroin in glassine envelopes.

The officers in *Howard* may have had greater reason for suspicion than those in this case, yet the Court of Appeals agreed with Criminal Term in its conclusion that defendant's flight could not escalate suspicion to anything more. It stated (50 NY2d, at p 588): "While we hold that there was a sufficient basis to permit inquiry, we agree that defendant had the right not to answer, that his running did not, absent any indication that any crime had been or was about to be committed, permit detention; that there was no probable cause for defendant's arrest; and that the vanity case had not been abandoned." At page 590, the court further commented: "There was, therefore, basis for questioning defendant, but there was nothing that made permissible any greater level of intrusion. The officers had no information that a crime had occurred or was about to take place, had not seen defendant do anything criminal, and were confronted only by facts susceptible of innocent interpretation * * * Presence in an area of 'frequent burglaries' was an insufficient basis". And, at page 592: "Defendant's

flight, had there also been indicia of criminal activity, would have been an important factor in determining probable cause * * * but where, as here, there is nothing to establish that a crime has been or is being committed, flight, like refusal to answer, is an insufficient basis for seizure or for the limited detention that is involved in pursuit".

The People further maintain that the officers here needed only reasonable suspicion of criminal activity to stop and detain defendant temporarily, citing CPL 140.50 (subds 1, 3) and *People v De Bour* (40 NY2d 210, 223) so that they were justified in chasing defendant, at which time probable cause to seize him would have been established by the discarding of the gun. However, the same circumstances which failed to provide probable cause to arrest defendant, similarly fail to provide the reasonable suspicion necessary to temporarily detain him.

In *Brown v Texas* (443 US 47, *supra*) police officers observed appellant and another man walking away from one another in an alley, in an area which had a high incidence of drug traffic. They believed the two men had been together or were about to meet, until the patrol car appeared, and the situation "looked suspicious". An officer got out of the car, stopped appellant and asked him to identify himself and explain what he was doing. Appellant refused and was arrested for violation of a Texas statute which makes it a criminal act for a person to refuse to give his name and address to an officer who has lawfully stopped him and requested the information. The Supreme Court held that the Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest, citing *Davis v Mississippi* (394 US 721) and *Terry v Ohio* (392 US 1, 16-19). The court said (pp 51-52):

"We have recognized that in some circumstances an officer may detain a suspect briefly for questioning although he does not have 'probable cause' to believe that the suspect is involved in criminal activity, as is required for a traditional arrest. *United States* v. *Brignoni-Ponce, supra* [422 US 873], at 880-881. See *Terry* v. *Ohio, supra,* at 25-26. However, *we have required the officers to have a reason-*

*able suspicion, based on objective facts, that the individual is involved in criminal activity. Delaware v. Prouse, supra [440 US 648], at 663; United States v. Brignoni-Ponce, supra, at 882-883; see also Lanzetta v. New Jersey, 306 U.S. 451 (1939).*

*"The flaw in the State's case is that none of the circumstances preceding the officers' detention of appellant justified a reasonable suspicion that he was involved in criminal conduct."* (Emphasis added.)

If no right existed in the officers to detain and therefore to pursue Berry, we must either suppress the weapon as the direct result of the illegal police action, or find that defendant's discarding of the weapon was a voluntary abandonment on his part, or the result of some intervening factor so that "the connection between the lawless conduct of the police and the discovery of the challenged evidence has 'become so attenuated as to dissipate the taint'" (*Wong Sun v United States,* 371 US 471, 487; *Nardone v United States,* 308 US 338, 341).

In denying the motion to suppress, the hearing court found that the actions of the police officers in pursuing defendant were illegal and that "[a]pplying the standards set in Boodle [*People v Boodle,* 47 NY2d 398], I find that as a result of thought and reflection, independent of the police illegality, the defendant ridded himself of the revolver he now seeks to suppress from evidence * * * Thus, the defendant, by his own conduct, severed the proximate connection between the initial police illegality and the discovery of the weapon."

The majority affirms Criminal Term, relying on *People v Boodle* (*supra*). In that case, an informant told detectives that defendant might have information concerning a homicide. They saw him on Eighth Avenue. He "did nothing to arouse even the slightest suspicion" (*supra,* pp 400-401). The officers stopped beside him and asked him to step over to the car. The detective then said that he wanted to speak to the defendant about the homicide and asked him to get into the rear seat of the car. They then drove away slowly. The officer warned defendant "Just keep your hands where I can see them." Shortly thereafter, the defendant threw a revolver out of the window and was observed by the offi-

cers, who retrieved it. Defendant was taken to the station house where 13 glassine envelopes containing heroin were found upon his person.

The court held that the defendant was seized within the meaning of the State and Federal Constitutions and that the seizure was clearly unlawful, since, prior to the seizure, the police had lacked evidence of probable cause linking him to criminal activity. It then held that "the defendant's act of throwing the revolver was not in direct and immediate response to the illegal detention, and that the revolver, disclosed as a result of defendant's independent act, was not tainted by the prior illegality." (*People v Boodle, supra,* p 402.)

The *Boodle* court reiterated that if the evidence was revealed as a direct consequence of the unlawful police action, it is tainted and must be suppressed. However, the court drew a distinction between a defendant seeking to rid himself of evidence in a "spontaneous reaction" to the police illegality and "an independent act involving a calculated risk," where the taint would be dissipated (*People v Boodle, supra,* pp 403, 404, citing *Wong Sun v United States, supra*). An examination of the examples given by the court to illustrate this dichotomy (*People v Baldwin,* 25 NY2d 66; *People v Loria,* 10 NY2d 368; and *People v Cantor,* 36 NY2d 106, for "spontaneity"; and *People v Townes,* 41 NY2d 97, for the independent, "calculated" act), illustrates, first, that the fact pattern now before us belongs with those acts which are the direct result of the police illegality. For example, in *People v Townes (supra)* the only example given by the court to support the "calculated" segment of its dichotomy, it was held " 'that Townes' free and independent action in pulling and attempting to fire the gun, taken after and in spite of, or perhaps because of, the plainclothesman's identification of himself as a police officer', dissipated the taint of the lawless police conduct (*People v Townes, supra,* at p 102; see *People v Martinez,* 37 NY2d 662)" *(People v Boodle, supra,* at pp 403-404). *Townes* thus features an affirmative act, calculated to achieve a result other than the mere jetisoning of incriminating evidence as a reaction to hot pursuit or some other pressing illegal police action. *Boodle*

further shows the difficulty of applying the "spontaneous-calculated" dichotomy espoused by the court, in all but the clearest circumstances, and encourages "hair splitting" and "razor-thin" categorization, which can only be detrimental to the consistency and predictability of the law in this area.[2]

Where a defendant, under the pressure of an illegal hot pursuit by the police, close upon his heels, jetisons contraband, can it be doubted that his act of throwing away the evidence was the result of the police illegality rather than a voluntary abandonment? Where the abandonment was coerced by unlawful police action, the property may be not used for evidentiary purposes. (See LaFave, Search and Seizure, § 2.6 [b], and cases cited therein.)

The motion to suppress evidence should be granted. The judgment of the Supreme Court, New York County (L. BECKER, J.), convicting defendant, upon his plea of guilty, of attempted criminal possession of a weapon in the third degree, and sentencing him to an indeterminate term of from one and one-half to three years' imprisonment, should be vacated, and the indictment should be dismissed.

MARKEWICH and LUPIANO, JJ., concur with BLOOM, J.; CARRO, J. P., and ASCH, J., dissent in an opinion by CARRO, J. P.

Judgment, Supreme Court, New York County, rendered on December 16, 1980, affirmed.

---

2. For critical comments on the *Boodle* decision see: Lewin, 1979 Survey of New York Law, 31 Syracuse L Rev, at pp 204-210. See, also, LaFave, Search and Seizure, § 2.6, p 64, 1982 Pocket Part.