THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v JOHN DIAZ and WILFREDO GOMEZ, Defendants.

First Department, August 2, 1984

APPEARANCES OF COUNSEL

*Paul Cooperstein* for John Diaz, respondent.

*Deborah Wolikow Loewenberg* for Wilfredo Gomez, respondent.

*Thomas N. Burrows* of counsel (*Mark Dwyer* with him on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for appellant.

### OPINION OF THE COURT

MILONAS, J.

On November 21, 1981, shortly after 5:00 A.M., Police Officer John Raiszetnyk and his partner were on uniformed patrol in an unmarked vehicle when they received a radio report of a man with a gun at 12th Street and Avenue A in Manhattan. As they headed in that direction, they noticed a white 1975 Pontiac stopped at a red light at the intersection of 11th Street and Avenue A. The officers were unable to maneuver their car around the Pontiac, so Officer Raiszetnyk blew his horn. At that point, a man sitting in the back seat of the Pontiac turned to look at the

officers. Officer Raiszetnyk thereupon recognized him to be Alex Ortiz, a person whom he had arrested on August 21, 1981 along with two other men. The three men had been charged with robbery for stealing an automobile from its owner at knifepoint. Officer Raiszetnyk was aware that there had recently been numerous robberies committed in the neighborhood by Hispanic males wearing black leather jackets and dungarees. Moreover, Officer Raiszetnyk could see that two other Hispanic men were in the front seat of the Pontiac.

According to Officer Raiszetnyk, when Ortiz turned to look at the policemen, he became very nervous, spoke briefly with the occupants in the front seat, then exited the vehicle on the passenger side, walking east. He had on a black leather jacket and dungarees. Although the officers permitted Ortiz to leave, Officer Raiszetnyk again beeped his horn, motioning to the driver of the Pontiac to pull over. The driver complied, and he and his companions stepped out of the car. Both men were wearing leather jackets and dungarees. The driver of the Pontiac, defendant John Diaz, then approached the police vehicle. Upon being asked to produce his license and registration, Diaz replied that he would have to get it. He walked back to the Pontiac, and Officer Raiszetnyk and his partner, after getting out of their automobile, followed him. They did not have their guns drawn. As Diaz bent down toward the glove compartment, ostensibly to search for his license and registration, Raiszetnyk reached into the Pontiac through the driver's side door, which was open, to determine if the ignition had been tampered with. The ignition was intact and the keys were still in it. Suddenly, the passenger, defendant Wilfredo Gomez, bolted down the street, and Diaz, who broke loose from the attempt by Officer Raiszetnyk's partner to detain him, also started to run. Officer Raiszetnyk first endeavored to pursue the other individual but had to return to assist in apprehending Diaz.

Officer Raiszetnyk took Diaz to the police car and read him the *Miranda* rights from a card. Diaz indicated that he understood and agreed to talk to the officers. He stated that the person who had run away was "Wilfredo" whose last name he believed to be "Rivera". Before removing Diaz

to the station house, the officer examined the Pontiac's registration. The parties stipulated that if the robbery victim were called to the stand, he would testify that the Pontiac in question was registered in his name. Diaz was subsequently searched and five rounds of .22 caliber ammunition were recovered. Defendant Wilfredo Gomez was arrested later that same day.

The trial court, in granting defendants' motion to suppress physical evidence, identification testimony and statements, concluded that an arrest had occurred when the police stopped the Pontiac but that the officers lacked probable cause at the time to believe that the defendants had committed a crime. However, it is evident from the proof introduced at the hearing that the defendants were not arrested when Diaz was requested to produce a license and registration. It was only after the defendants began to flee from the scene that the arrest took place. As the Court of Appeals has held, the police are permitted to stop a vehicle and make inquiry of its occupants if they have "reasonable suspicion" to believe that the occupants are engaged in criminal activity. (*People v Sobotker,* 43 NY2d 559; *People v Ingle,* 36 NY2d 413.) In that connection, "reasonable suspicion" has been defined as that "quantum of knowledge sufficient to induce an ordinarily prudent and cautious man under the circumstances to believe criminal activity is at hand." (*People v Cantor,* 36 NY2d 106, 112-113; *People v Sobotker, supra,* at p 564.)

In the instant matter, the officers possessed the requisite reasonable suspicion to stop the Pontiac for the purpose of making further inquiry of its occupants. The suspicion by the police that the Pontiac had been stolen was not simply the result of a hunch or gut reaction but was, in the totality of the circumstances, entirely reasonable. (See *People v Chestnut,* 51 NY2d 14, cert den 449 US 1018.) It was based upon the presence of a known car thief, Alex Ortiz, in the back seat of the car, the fact that it was five o'clock in the morning in a high crime area, the nervous departure of Ortiz when he spotted the officers and the fact that Ortiz was dressed in a black leather jacket and dungarees, clothes similar to those which had been worn by the perpetrators of a recent series of robberies in the same

neighborhood. Only a few months earlier, Officer Raiszetnyk had arrested Ortiz and two other men for stealing an automobile at knifepoint. Now Ortiz, who had again been discovered in the presence of two other men only a number of blocks from the site of his prior arrest, suddenly became very nervous and left the car upon seeing the officers. Consequently, while it was not absolutely certain that the three men were involved in some sort of criminal activity, there was clearly enough here to warrant reasonable suspicion.

Moreover, the degree of intrusion into the defendants' freedom was quite minimal. The officers merely directed Diaz, the driver of the Pontiac, to pull the automobile over to the curb and then asked him for his license and registration. They did not draw their guns and, indeed, remained in the police car until Diaz, having not yet produced his license and registration, walked back to the Pontiac. Then, as Officer Raiszetnyk waited for Diaz to procure the requested documents, the defendants, who also had on leather jackets and dungarees, tried to make their escape, leaving the Pontiac behind. Of course, the flight of an individual does not, absent other indicia of criminal conduct, provide probable cause to make an arrest. (*People v Howard,* 50 NY2d 583, cert den 449 US 1023.) However, the flight of these defendants after their failure to produce a license and registration, particularly when the police already had reasonable suspicion to believe that the car which they were in was stolen, gave rise to the probable cause necessary to support the ensuing arrest. (See *People v Berry,* 87 AD2d 53, wherein this court found that the defendant's flight in the context of that case was a relevant factor for consideration.) The police, in the situation before us here, acted reasonably throughout their encounter with the defendants, and, accordingly, the motion to suppress should have been denied.

Order of the Supreme Court, New York County (Manuel Gomez, J.), entered on July 13, 1982, which granted defendants' motion to suppress physical evidence, identification testimony and statements, should be reversed, on the law, and the motion to suppress denied.

CARRO, J. (dissenting). Two officers received a radio call that another officer needed help with a "man with a gun". They drove to his assistance but before they got to their destination they came up behind a late-model white Pontiac (in "good condition") which was properly stopped for a red light. Not being able to "squeeze around" it, the officer driving beeped the horn, and the back-seat passenger turned around. Officer Raiszetnyk testified that he recognized this man as someone he had arrested the previous summer, for auto theft. Indeed, the man began acting nervously, spoke with the two men in front, and then got out of the car, *walking* away, past the patrol car. The officers made no move to stop this individual, identified as Alex Ortiz, but instead ordered the driver of the Pontiac to pull over.

Giving full credit to the officer's testimony (at the suppression hearing) that the remaining occupants of the Pontiac could be seen to be male Hispanics wearing leather jackets, there is still no reasonable predicate for this stop. No traffic violation had been committed, the men (as opposed to Ortiz) did not appear nervous, and they were not at the location ascribed to the "man with a gun". The car was not even reported stolen until an hour later.

Had the officers chosen to stop Ortiz as he walked away, based on the knowledge of his prior arrest, his present nervous behavior and, perhaps, a suspicious bulge, one might be justified in finding such a scenario to provide the requisite "reasonable suspicion" (*People v Sobotker,* 43 NY2d 559). From there, the further detention and inquiry of defendants Diaz and Gomez could possibly be justified.

Of course, that is not what happened, and the police were not able to demonstrate a foundation for their hunch. (Cf. *People v Santiago,* 64 AD2d 355.) While there may, indeed, have been many recent incidents in that area involving male Hispanics wearing jeans and leather jackets, the number of citizens wearing such garb is too enormous for such an outfit to signal suspicion. Likewise, a car on the streets of New York City at 5:00 A.M. is no rare occurrence, and the officers, as noted, had no reason to be curious about this car. Even Ortiz, in what he actually did do, was not truly furtive. Simply put, the circumstances do not support

a conclusion that the stop of defendants was a reasonable exercise of the officers' statutory or common-law right of inquiry. (CPL 140.50, subd 1; *People v Allende,* 39 NY2d 474; *People v Martinez,* 37 NY2d 662; *People v Cantor,* 36 NY2d 106; cf. *United States v Brignoni-Ponce,* 422 US 873.)

Thus, there being no attenuation of the taint of the initial stop, the subsequent arrest was illegal and the car, other property and identification were all properly suppressed by the court below. (*People v Cantor, supra; People v Ingle,* 36 NY2d 413.) For these reasons the order appealed from should be affirmed.

SANDLER, J. P., and ROSS, J., concur with MILONAS, J.; CARRO and FEIN, JJ., dissent in an opinion by CARRO, J.

Order, Supreme Court, New York County, entered on July 13, 1982, reversed, on the law, and the motion to suppress denied.