■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DWAYNE BOULWARE, Appellant.—Judgment of the Supreme Court, New York County (Rena K. Uviller, J.), rendered May 28, 1985, which, after a plea of guilty, convicted defendant-appellant, Dwayne Boulware, of attempted criminal possession

of a weapon in the third degree and sentenced him to a term of five years' probation, is reversed, on the law, the motion to suppress the weapon granted, the sentence vacated and the indictment dismissed.

On January 17, 1985, undercover Police Officers Ronald Betterly, Brian Murphy and Charles Morrison were on patrol in an unmarked police car in the vicinity of 8th Avenue between 150th and 155th Streets in Manhattan. Officers Betterly and Murphy, who testified at the suppression hearing, described the area, particularly the corner of 152nd Street and 8th Avenue, as having a high incidence of drug-related and weapons arrests. While driving past that particular corner at around 11:15 P.M., the officers noticed a group of from 10 to 15 people on the corner, and Officer Murphy believed one of those individuals, later identified as defendant Dwayne Boulware, was actually Cornell Everett, also know as Cornell McCoy, who, both Murphy and Betterly knew, had a lengthy arrest record for gun possession offenses.

The officers decided to turn around and stop at the corner. They planned to have Officers Murphy and Morrison disperse the crowd while Betterly isolated defendant to question him as to what he was doing. This plan was based on Officer Betterly's "very strong suspicion" that the crowd was involved in criminal activity. As the officers started to disperse the crowd, Betterly approached defendant. When Betterly was still 10 feet away from defendant, he called out that he wished to speak to defendant. As defendant turned to face the officer, he immediately put his right hand into his right coat pocket. Fearing for his safety, Betterly placed his hand on his holster and ordered defendant to remove his hand from his pocket. Defendant refused. When the officer took a step toward him, defendant fled. Betterly and Murphy ran after defendant and caught up to him as he slipped on ice. Defendant was holding a silver gun in his hand.

In a written decision, Justice Uviller denied defendant's suppression motion, and defendant thereafter pleaded guilty to attempted criminal possession of a weapon in the third degree. He was sentenced to five years' probation. On this appeal defendant challenges the propriety of the initial approach and inquiry and the subsequent pursuit upon his flight. We conclude that the initial approach and inquiry were unlawful, requiring us to suppress the tainted fruit of that unreasonable street encounter.

A police officer may approach a private citizen to request information "when there is some objective credible reason for

that interference not necessarily indicative of criminality." *(People v De Bour,* 40 NY2d 210, 223.) A second level of inquiry, "the common-law right to inquire, is activated by a founded suspicion that criminal activity is afoot and permits a somewhat greater intrusion in that a policeman is entitled to interfere with a citizen to the extent necessary to gain explanatory information, but short of a forcible seizure [citations omitted]." *(Supra,* at 223.)

The first level of inquiry is generally applicable to police officers' performance of various public service functions, as to which they "should be given wide latitude to approach individuals and request information." *(Supra,* at 218.) The *De Bour* court noted that typical instances would include the right of an officer to request information at the scene of an accident, upon finding a lost child or in other situations where the police are rendering assistance to those in distress. The court then distinguished those situations "when police officers are engaged in their criminal law enforcement function" and warned that in those situations "their ability to approach people involves other considerations and will be viewed and measured by an entirely different standard of reasonableness." *(Supra,* at 218-219.) Thus, "a policeman's right to request information while discharging his law enforcement duties will hinge on the manner and intensity of the interference, *the gravity of the crime involved* and the circumstances attending the encounter. Thus, *while it might be reasonable for the police at the scene of a crime to segregate and interview witnesses, the same procedures would not be justified if done on a whim or caprice".* *(Supra,* at 219 [emphasis added].) Isolating one particular person among others and making inquiries as to that person's conduct, therefore, can only be justified on a founded suspicion, one based on objective criteria, that criminal activity is afoot. *(Supra,* at 223.)

In spotting defendant Boulware in a high-crime area and believing him to be a person they knew had been previously arrested for gun possession offenses, the three officers, on those two grounds alone, decided to alight from their car, disperse the crowd on the corner, segregate defendant and question him "to see what he was doing." It is clear from their own testimony that the officers were bent on conducting a law enforcement investigation of defendant's conduct. The propriety of such an investigation must be measured against the standard of a founded suspicion that criminal activity is afoot, and that standard was most certainly not met here.

As Justice Fein noted in his majority opinion in *People v*

*Cornelius* (113 AD2d 666, 671), "[i]t may very well be possible that a random search of all passersby on the street in this particular neighborhood at this time of night would have yielded a lot of contraband. But the individual liberties in our Constitution are not based upon statistical probabilities. The constitutional protections against unwarranted intrusion by an agent of the State are not to be relaxed when an individual goes for a walk, or engages in otherwise innocent behavior, in a public area statistically known for a high incidence of crime. The 4th Amendment has never been so amended."

It still has not. And, even though the Court of Appeals has most recently clarified that "the nature and location of the area where a suspect is detained may be one of the factors considered in determining whether, in a given case, the police acted reasonably" *(People v Bronston,* 68 NY2d 880, 881), that factor must nevertheless exist in combination with objective factors specific to the incident which together support a founded suspicion that some particular criminal activity may be afoot. Otherwise, an officer may not segregate an individual from a group of people gathered in a public place and inquire as to that person's conduct.

Similarly futile, as far as sustaining this police encounter, is any reliance on the police officers' belief that defendant was a person known to them to have had gun possession arrests. That belief was also an insufficient basis upon which to found an objective suspicion of present criminal activity. To hold otherwise would be to exclude all persons with arrest records from the protection of the Fourth Amendment and render them subject to arbitrary stops and inquiries.

Knowledge of a person's past record may, like the high-crime area factor, be relevant in determining whether a police officer's conduct during a lawful encounter is reasonable. But a founded suspicion of criminal activity arises only when there is some present indication of criminality based on observable conduct or reliable hearsay information. An officer's mere unscientific guess as to a person's propensity to commit crimes, without some objective indicia that a crime has taken, will take, or may be taking place, is simply insufficient to justify isolating that person from a group of people and making inquiry as to his conduct.

There was a total absence of specific objective indicia of criminality. Defendant's conduct was totally innocuous. He was simply standing on a street corner with others. There was no claim of loud disturbances, violence, use of abusive language, obstruction of vehicular or pedestrian traffic or any

other conduct suggestive of criminality or of an intent to cause public alarm. We need not address whether, based on these facts, the officers had authority to disperse the crowd. But, even assuming such authority for the moment, their decision to also isolate defendant and make inquiry of him when he was only conducting himself exactly like the others on this corner manifests either an impermissible intent to harass him because of his prior record or an improper decision to investigate based on a vague, unparticularized hunch that he might be up to no good. In either case, defendant's Fourth Amendment rights were violated.

Also unavailing was the lower court's reliance on *People v Berry* (87 AD2d 53) to justify this police encounter. In *People v Berry*, the police officer who attempted a conversation with defendant Berry had in the past had similar conversations with him in the street and knew of his prior arrests as a drug dealer. The officer never left his car, never segregated Berry from a crowd of people, and only wanted to tell Berry that he should keep clear of that particular area, as there was pressure to keep the area clear of drug trafficking. This court, finding this approach to have been minimally intrusive and based on a good-faith motive, in effect, determined that the encounter had not reached the level of an investigation under the common-law right of inquiry so as to require a founded suspicion of criminality. *(Supra,* at 57.) By citing *De Bour (supra)* to uphold the police officer's approach, while at the same time conceding the absence of any indication of criminality, it is clear that the *Berry* court analyzed the police encounter therein as an approach to request and convey information and not an approach to conduct an investigation under the common-law right of inquiry. *(Supra.)*

When the officers herein decided to alight from their car, disperse the crowd, segregate defendant and inquire as to what he was doing, they laid bare their intent to conduct an investigation under their common-law right of inquiry. Yet, there were no objective facts upon which to found a suspicion that criminal activity was afoot. It is interesting to note on this point that the *Berry* court itself concluded that the mere presence of a known drug dealer in a high drug-prone area did not amount to an "indication of criminal activity." *(People v Berry, supra,* at 57.) Neither does the mere presence in a high-crime area of a person known for gun-related arrests amount to an indication of criminal activity.

Finally, the dissent's reliance on *People v Leung* (68 NY2d 734) is totally misplaced. In *Leung,* the police officers, while in

a neighborhood known for drug trafficking, observed defendant pass to another what appeared to be a "three dollar bag", a package commonly used in drug sales. *(Supra,* at 735.) The court concluded that this observation constituted an objective credible reason for the police to approach defendant. The facts of *Leung* are inapposite and, thus, its result is obviously inapplicable to the situation herein, where the police officers failed to observe or otherwise learn of any conduct on the part of defendant Boulware suggestive of criminality.

Accordingly, this approach was improper, the weapon seized must be suppressed as the unlawful tainted fruit of this encounter and the judgment vacated and the indictment dismissed. Concur—Ross, Carro, Rosenberger and Wallach, JJ.

Kupferman, J. P., dissents in a memorandum as follows: I would affirm.

Accepting the majority's analysis of the factual situation, one can only conclude that good police work is being undermined by a misinterpretation of applicable precedent.

As the Court of Appeals most recently stated, in *People v Leung* (68 NY2d 734, 736):

"The present case presents a situation wherein the level of police intrusion was an appropriate response to the observations and beliefs of the officers involved.

"Although in exiting their unmarked car and identifying themselves as policemen the officers may have intended to seek explanatory information from defendant, or to detain him, there is no evidence that, prior to defendant's light, the police did anything more than approach him * * *

"Given that the initial approach and the subsequent pursuit and detention of defendant constituted legitimate, justifiable police conduct, manifestly the recovery of the gun discarded during flight was also lawful."