OPINION OF THE COURT
Carol Berkman, J.
On December 7, 1989, at about 9:30 p.m., Sergeant Giardina and his partner approached Annette Evans, a 19-year-old African-American woman with no prior record, as she was about to board a bus in the Port Authority terminal. After a brief conversation, the sergeant told her he thought she was carrying drugs. A search of her hand luggage revealed several ounces of cocaine in a brown paper bag.
She moves to suppress this evidence, as well as statements made to the arresting officer. At the hearing held before me on March 23, 1990, the People failed to come forward with credible evidence to justify Sergeant Giardina’s actions or to meet their heavy burden of demonstrating that defendant consented to the search. (People v Berrios, 28 NY2d 361.) To the contrary, the picture that emerges is one of discriminatory law enforcement which does incalculable damage to our civil liberties but produces at best questionable results for the war on drugs. The evidence is suppressed; the statements are suppressed as a product of the unlawful search and seizure.
THE TESTIMONY AND FINDINGS OF FACT
Sergeant Giardina was the only witness to testify with regard to the events leading up to defendant’s arrest. He has served over 16 years with the Port Authority Police Department (PAPD), 12 at the bus terminal and more than 2 as supervisor of a special anticrime plain-clothes detail. He began his testimony with a description of the techniques of the PAPD drug interdiction unit, of which he is a part.
The interdiction program began as the result of intelligence *813 that large amounts of drugs are going out of the terminal.[1] The technique of the program is to observe unusual behavior. The witness was adamant that the program does not use "profiles” and denied any knowledge of the Federal drug profiles.
If a person is behaving unusually, two plain-clothes officers approach and engage that person in conversation. As Sergeant Giardina put it, "during that conversation you further enhance your own suspicions on whether or not they may or may not be carrying * * * drugs.” The next step is to ask whether the person would mind having his/her bag searched. Contrary to the practice of the Amtrack police, however, the officers do not explicitly explain the right to refuse.
The People offered no written regulations governing this program, although one relevant memorandum was referred to briefly on cross-examination, but not placed in evidence.
The program’s techniques are apparently highly successful in obtaining the "cooperation” of the people approached. Sergeant Giardina has personally participated in 40 to 50 interdiction stops. Seven to 10 persons refused to speak with the police. Four or five who agreed to speak to the police refused to allow their luggage to be searched. The witness was not asked whether all of those who agreed to speak with the police were also asked to consent to a search.
Sergeant Giardina estimated that he has stopped approximately 15 Hispanics, 15 Blacks, 5 or 6 Orientals, and 5 to 10 Whites. As to Blacks and Hispanics he gave the same numbers when he thought he had been asked for the number of arrests: that is, 15 Hispanics stopped and 15 arrested; 15 Blacks stopped and 15 arrested. He was not asked for arrest figures for Orientals and Whites.
No routine paperwork is kept for a stop which does not result in an arrest. No evidence was offered to dissipate the appearance of racial and ethnic bias implicit in the numbers supplied by the sergeant.[2]
The sergeant appeared to be an experienced witness, but *814 unable to articulate, when pressed, the factual bases for his conclusions. He became nervous, somewhat truculent, and inconsistent, when required to detail his asserted observations of unusual behavior or inconsistent responses from the defendant. For these reasons, he was not credible.
The sergeant said he first noticed Evans as he was following a trio he suspected of engaging in a confidence game. Her cab pulled up on 41st Street and a male passenger lifted himself up over the door, looked around, got out on the traffic side, and crossed the street. Evans did the same. The male went toward the corner, at Eighth Avenue, and she went toward the Port Authority entrance in the middle of the block, both of them looking around continuously. After at most half a minute they came back together and entered the north wing of the terminal together. The sergeant said he thought both the method of alighting and the temporary separation unusual, albeit not sufficiently so to pull him away from his original quest.
"Looking around continuously” is a red flag to a drug interdiction officer, and that behavior is described repeatedly in drug interdiction cases and opinions. But one wonders how the sergeant could so closely follow the suspected con-game trio while also so carefully observing a couple who made his job even more difficult by going in different directions (which happens to be another popular example of "unusual behavior” in drug interdiction cases).
After the sergeant discovered that the suspected confidence game was two good Samaritans helping someone with directions, he got his partner and went in search of Evans, whom he found waiting in line at gate 70 on the lower level. Her erstwhile companion was not there and never reappears in the case.
The sergeant concealed himself, apparently without noting the scheduled departure time for the bus from gate 70, and watched Evans for more than 20 minutes. During that time, *815 he testified, she looked around continuously, swiveling her head back and forth and fidgeting. According to the sergeant, her behavior was unlike that of the other 10 or more people in line, who were reading, sitting on the floor or their luggage, talking or standing, all, he said, without fidgeting.[3] Her green, gym-type medium-sized bag was 5 or 6 feet way from her, closer to the entrance to the loading dock.
Finally, the bus began to load. As Evans walked forward, she picked up her bag and entered the loading dock. At this point, the sergeant and his partner, Officer Ryan, approached. The sergeant stood in front of Evans; his partner was three feet away toward the wall and to the sergeant’s left; the bus was on Evans’ left and the sergeant’s right. They were about a foot from the door of the bus and a foot out of the path of the other passengers, who were walking into the loading dock behind Evans and then around the group, going to the left to load their luggage or the right to board. Both police officers had their shields out but wore plain clothes.
The sergeant asked Evans where she was going, where she had been, and her age.[4] According to the sergeant, she gave inconsistent answers to these questions. She said she was going to Wilmington, North Carolina, and had been in New York for a visit. The sergeant "believe[d]” she said she was visiting her mother in the hospital, but then said she did not live in Wilmington but was just visiting, and that her mother was there. She said she was 16, but quickly amended to 19. On further questioning, the sergeant himself amended his account: "possibly” she said she was visiting her aunt in New York and then said she was going to Wilmington to visit her aunt or (on cross-examination) her grandmother.
On the subject of the supposed inconsistencies in Evans’ account of her activities, the sergeant’s testimony was itself inconsistent. He impressed in manner as actually remember *816 ing and/or relating little of actual events. Here, as in other areas of his testimony he provided a veritable grab bag of "suspicious facts”, apparently according to formula.
Evans assertedly became increasingly nervous as he questioned her, but never sought to terminate the interview or to leave, although she was free to go.
Finally, Sergeant Giardina told Evans he thought she was carrying drugs and asked if she would mind if the police searched her bag. She said "okay”, but (in accord with the standard operating procedure of the drug interdiction program) he asked her again, upon which she again assertedly assented and handed the bag to Officer Ryan. He found a brown paper bag inside the gym bag. Once again, the sergeant went through the routine, asking whether the brown bag was hers. When she said no, he asked (twice) whether she would mind their searching the bag, was she sure she would not mind. According to the sergeant, she was sure.
The sergeant did not know whether the bus was fully loaded and the luggage compartment closed at this point. As best he recalled, the bus was still there when Evans was arrested, immediately after cocaine was found in the brown paper bag.
After her arrest, warnings were properly administered pursuant to Miranda v Arizona (384 US 436). Evans told the arresting officer that she had visited her grandmother in Brooklyn and then her aunt in Manhattan. A male in Brooklyn placed the package in her gym bag and gave her instructions.[5]
The defense presented no evidence.
CONCLUSIONS OF LAW
The operations of the Port Authority drug interdiction program, as presented at this hearing, bear every hallmark of being the pedestrian/bus-traveler equivalent of a roving roadblock, without any proof that the program operates "in a uniform, nonarbitrary and nondiscriminatory manner” (People v Scott, 63 NY2d 518, 524), or that it is " 'carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers’ ” (supra, at 525). The evidence reveals no real controls on the individual officers. Moreover, *817 no records are required to be kept of stops, so that the PAPD (and the courts) will never know with any certainty how many people are stopped, or by whom, or under what circumstances. (Cf., People v Genn, 144 Misc 2d 596, 599 [Sup Ct, Bronx County, Bamberger, J.] [failure to keep records of cabs stopped pursuant to a livery-cab-safety program].)
Certainly, the problem of the trade in illicit drugs is an extraordinarily serious one, but no crime is so serious under our constitutional system as to justify giving virtually unfettered discretion to the police. As Judge Wachtler pointed out in People v John BB. (56 NY2d 482, 488), "Although not controlling, the elimination of the element of arbitrariness has been identified time and again as a critical factor in determining the reasonableness of official investigative activity of an intrusive nature”.
The premeditated and systematic nature of the Port Authority stops alone might alone take them out of the rubric of the mere request for information described in People v De Bour (40 NY2d 210). Annette Evans was targeted, even more than the defendant in People v Boulware (130 AD2d 370, appeal dismissed 70 NY2d 994). The purpose of the stop, by the sergeant’s own admission, was not to obtain information, but to enhance suspicion.
In People v Catoe (NYLJ, Aug. 22, 1989, at 22, col 1 [Sup Ct, NY County]), Justice Obus concluded that so-called unusual conduct, much like that described by Sergeant Giardina in this case, supported not only a request for information but a common-law stop. He also found that an encounter like the one in this case was indeed more than a request for information. This court agrees with the latter conclusion, but cannot agree that so-called unusual behavior, even when viewed through the prism of police "expertise”, rises to the level of reasonable suspicion.
The issue would be easier if the same standard applied to pedestrians as to automobiles. But while stopping a moving vehicle is unquestionably a "seizure” (see, People v Scott, supra; People v John BB., supra; People v Genn, supra), stopping a moving pedestrian, even one who is clearly on his way somewhere, does not receive the same constitutional deference. (E.g., United States v Mendenhall, 446 US 544, 557.) Instead, the question of whether police-citizen encounters such as the one in this case are seizures has confounded the Supreme Court. (Compare, Reid v Georgia, 448 US 438, with *818 Florida v Royer, 460 US 491, and United States v Mendenhall, supra.)
Although the Justices were unable to reach anything but plurality "agreement” in Mendenhall and Royer (supra), and although Reid (supra) appears inconsistent with those cases, it would appear that the PAPD has relied heavily on them for the legal blueprint for its drug interdiction program. This is unfortunate, for if anything can be distilled from these cases, it is that the courts have failed to provide the police with clear, understandable guidelines for their work. Perhaps resort to our NY Constitution, article I, § 12 may yield clearer standards.
Reid (supra) at least seems to settle the question of whether what was known to Sergeant Giardina, assuming for the moment his total truthfulness, amounted to reasonable suspicion. It did not. Defendant arrived at the terminal with a man. They both looked around carefully before alighting and while crossing a busy street. They separated momentarily. She was hypervigilant and nervous while waiting in line. Once approached, she was inconsistent, or at least unclear, about whom she was visiting and whether she lived in or was only visiting Wilmington. She supplied the wrong age and immediately corrected herself. These "facts” fall far short of the information known to the police in Mendenhall (supra), although they were no doubt suspicious to a police officer who also sees a con game when helpful people show a stranger his way.
If police expertise can see criminality where civilians are blind, at least the police should be able to articulate and explain their suspicions and conclusions, as indeed the Drug Enforcement Administration did in Mendenhall (supra). The incantation that behavior is "unusual” cannot suffice.
Too much deference to police "expertise” is an abdication of judicial responsibility, particularly where, as here, the police officer’s own testimony shows that his expertise focuses to a disproportionate extent on Blacks and Hispanics. By the sergeant’s own testimony, 65% to 75% of the people stopped are Black and Hispanic. They may comprise an even higher percentage of those actually arrested (and indicted). Surely this "pattern of strikes” might give rise to an inference of discrimination which requires rebuttal. (Cf., People v Jenkins, 75 NY2d 550 [discriminatory pattern of preemptory challenges].) But the PAPD does not keep records which might *819 rebut this inference. Thus, to the extent that the courts do not analyze the components of the so-called expertise, we may be approving of actions based on racial or ethnic bias. (Cf., People v George T., 39 NY2d 1028 [ethnic identity of youths on Madison Avenue created the basis of the officer’s suspicion].) Minorities did not fight their way up from the back of the bus just to be routinely stopped and interrogated on their way through the terminal.
Most of the Trial Judges who have examined PAPD drug interdiction cases have found the searches illegal. Judge Ira Beal so ruled in People v Dixon (ind No. 3958/89), People v Cogal (ind No. 8142/89) and People v Robinson (ind No. 3509/89). Justice Felice Shea rejected an argument of voluntary consent in a case involving the Amtrack police at Penn Station in People v Brown (ind No. 13021/89). Judge Leslie Crocker Snyder found PAPD conduct constitutionally offensive in People v Trusty (ind No. 4552/89 [oral decision delivered Dec. 14, 1989]) as did Justice Clifford Scott in People v Austin (ind No. 8579/89). (But see, e.g., People v Saunders, NYLJ, July 28, 1989, at 18, col 5 [Sup Ct, NY County, McLaughlin, J.].)
In People v Wilson (NYLJ, Mar. 27, 1990, at 23, col 3 [Sup Ct, NY County]), Justice Howard Bell found that a person stopped once he boarded a bus was "effectively immobilized” and "confined” so that, lacking reasonable suspicion or voluntary consent, suppression was mandated (at 24, col 3). With respect to the consent issue, Judge Bell noted that "approaching a subject after he boards a bus — an element of the drug intern unit’s regular routine * * * — is psychologically coercive, since it limits the suspect’s options in both time and space” (at 24, col 3).
In this case, the officers stopped Ms. Evans outside the bus, so that she was not as trapped as was the defendant in Wilson (supra). But her options were certainly limited in time, notwithstanding that Sergeant Giardina was unaware, he said, of when the bus was due to depart, or whether loading was complete. Quite obviously, the technique of watching and waiting for long periods, consistently approaching only when the bus is loading and imminently to depart is not solely to see whether something innocent will occur to explain the suspect’s nervousness, but just exactly to limit options in time and space and thus to increase the psychological coercion.
Sergeant Giardina stood in front of Evans. The bus was to *820 one side of her and Officer Ryan to the other. Incoming passengers, as well as Officer Ryan, blocked her retreat. This was contrary to Sergeant Giardina’s own description of PAPD practice, which he said was to walk with a subject who is moving. Evans may have been theoretically free to leave. But the techniques used were designed to minimize the possibility that she might exercise that option, which she could do only by abandoning her bus and/or making an end run around a police officer who was showing his shield.
The intrusion was capped by Sergeant Giardina’s statement that he thought Evans was carrying drugs. That accusation puts the lie to the argument that this was merely an informational inquiry. As in People v Taveras (155 AD2d 131 [1st Dept]), this was a full stop, and on inadequate grounds.
Under these circumstances, the issue of voluntary consent for the search of the bag is quickly dealt with by the analysis set forth in People v Gonzalez (39 NY2d 122). First, the defendant had been detained illegally. Second, the 19-year-old defendant had no previous experience with the criminal law. She was never advised explicitly of her right to refuse consent, a particularly important factor here because the sergeant had already accused her of carrying drugs. While it might be said that she otherwise cooperated with the police, their behavior was sufficiently coercive, and the other factors sufficiently significant, to overcome any inference of consent this cooperation might raise. On all of these factors, together with the problems of credibility previously discussed, the evidence is insufficient to establish consent.
The statements made to the arresting officer must be suppressed as products of the unlawful search and seizure.

. Illegal drugs are a problem beyond crisis proportion. Nonetheless, it is noted that in other cases requiring the balancing of individual freedom against governmental interest, data specific to the problem at hand have been supplied, at least to the appellate courts. (E-g., United States v Mendenhall, 446 US 544, 562; Delaware v Prouse, 440 US 648, 658-661; United States v Brignoni-Ponce, 422 US 873, 878-879; People v Scott, 63 NY2d 518, 525-529.)

. While personal impressions and anecdotal accounts have no eviden *814 tiary value, it may be of at least background interest to comment that I arraign approximately one third of the felony cases in New York County and have no recollection of any defendant in a PAPD drug interdiction case who was not either Black or Hispanic. Judges SolofF and Roberts, the two other arraigning Judges for New York County, also have no such recollection. The prosecutor’s office has been asked to investigate this phenomenon, but we have not been made aware of any such investigation. (See also, Belkin, Airport Drug Efforts Snaring Innocents Who Fit 'Profiles’, NY Times, Mar. 20,1990, at 1, col 5.)

. This testimony bears remarkable similarities to that given by Sergeant Giardina in People v Catoe (NYLJ, Aug. 22, 1989, at 22, col 1 [Sup Ct, NY County]), in which Justice Obus described the testimony as follows: "During the 25 to 30 minutes he was under observation, defendant exhibited distinct signs of nervousness. He repeatedly looked behind and in front of him, walked a few steps, looked around and walked back to where he had been. In this way he acted in a manner considerably different from that of all of the other people waiting in the area.”

. Evans, though petite, appears her stated age of 19, but juveniles suspected of being runaways apparently make up a significant proportion of those approached by the PAPD drug interdiction unit. (E.g., People v Tisdale, NYLJ, Apr. 10,1990, at 22, col 4 [Sup Ct, NY County, Berman, J.].)

. The defense does not seriously assert that the warnings were not administered properly or that any statements were obtained involuntarily, and this court finds beyond a reasonable doubt that the statements were voluntarily obtained.