People v Bailey (2024 NY Slip Op 50997(U))

[*1]

People v Bailey

2024 NY Slip Op 50997(U)

Decided on August 1, 2024

Supreme Court, Kings County

Daniels-DePeyster, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on August 1, 2024
Supreme Court, Kings County

The People of the State of New York

against
Donovan Bailey, Defendant.

Indictment No. 2150-20

Michael Pate, Esq. of The Legal Aid Society for the defendant
ADA Salvatore Prince for DA Eric Gonzalez, Kings County District Attorney's Office

Claudia Daniels-DePeyster, J.

The defendant charged with Criminal Possession of a Weapon in the Second Degree (PL § 265.03[3]) and other related charges moves to suppress the recovered firearm, two identification procedures and two statements allegedly made by the defendant to law enforcement. On August 23, 2022, December 1, 2023, February 23, 2024, and April 10, 2024, this Court conducted a combined Dunaway/Mapp/Huntley/Wade hearing. The People called four witnesses: Police Officer Vincent Turton, Detective Daniel Gerardi, Detective Jay Rivera, and Detective Omar Veliz. Additionally, the People introduced three exhibits: the defendant's statement as noted by Officer Turton, a disc containing the defendant's statement at the precinct, and the photo array paperwork. The defendant did not present any witnesses or introduce any evidence. 
Based upon the testimony at the hearing and the applicable law, the motion to suppress is DENIED. I. FINDINGS OF FACT
As a preliminary matter, the Court finds that the witnesses were credible. 
A. Police Officer Vincent Turton
Police Officer Vincent Turton has been with the New York City Police Department (hereinafter "NYPD") for approximately sixteen years and is currently assigned as a patrol officer with the 75 Precinct (Aug. Tr.[FN1]
at 22). Officer Turton's duties include: responding to radio calls, going to hospitalized prisoners and transporting prisoners to Central Booking, among other things (Aug. Tr. at 23).
According to Officer Turton, on November 22, 2020, he was instructed by his patrol supervisor to watch a prisoner at Brookdale Hospital in Kings County (Aug. Tr. at 23). Between [*2]approximately "3:45 and 4:15-ish" Officer Turton, who was in uniform, arrived at Brookdale Hospital and relieved Officer Torozian who was "sitting on the person [Officer Turton] had to watch" (Aug. Tr. at 24). At the hearing, the officer identified that person as the defendant, Donovan Bailey (Aug. Tr. at 25-26). Officer Turton was safeguarding the defendant in the hospital emergency room area, where the defendant was restrained with leg shackles and was handcuffed to a chair (Aug. Tr. at 26-24).
At approximately 4:30 or 4:35 PM the defendant asked Officer Turton "if he could use the phone to make a phone call" and the officer told him that "at this time he can't make a phone call, we'll see about that when he gets back to the precinct" (Aug. Tr. at 27, 39). A few minutes later, at approximately 4:50 PM, the defendant again requested to make a call (Aug. Tr at 27, 39). At approximately 5:00 PM, the defendant asked a third time, to which the officer responded: "Again, I can't give you [a] phone call, you're not allowed to have phone calls until I speak to a supervisor, and you'll probably get a phone call when you get back to the precinct and you're being processed" (Aug. Tr. at 28, 40). According to Officer Turton, the defendant then "just started making spontaneous utterances" saying, "Officer, I'm going to tell you what happened, I'm just going to tell you what happened" (Aug. Tr. at 28). The defendant went on to say, "that he did that thing, that he actually had- prior in the day, he had taken some Xanax, Percocet, and some other pills, and that he went outside, he found a gun, he did that thing, and the only reason he didn't turn it towards the cops that day is because he thought of his mom. He wished he was dead right now, he wished he wasn't alive" (Aug. Tr. at 29). Officer Turton memorialized this when he returned to the precinct and the People entered the officer's handwritten statement into evidence as People's Exhibit 1 (Aug. Tr. at 30; see People's Exhibit 1 — Statement). The defendant then asked again to use the phone and was told again by the officer, "I cannot give you the phone, I cannot let you use my phone, I cannot let you use the phone here in the hospital, you have to wait until you get back to the precinct" (Aug. Tr. 42-43).
B. Detective Daniel Gerardi
Detective Daniel Gerardi has been with the NYPD for approximately eleven years and is currently assigned to the 75 Precinct Detective Squad (Dec. Tr.[FN2]
at 22). The detective's duties and responsibilities include: "overall casework, anything from petit larcenies and thefts to shootings, homicides, violent felony assaults. All those cases, for all those complaints that are taken, cases are generated, sent to the Detective Squad and I am one of the detectives catching those run of the mill everyday cases" (Dec. Tr. at 4).
On November 22, 2020, at approximately 1:19 PM detective, then officer, Gerardi was in an unmarked police vehicle in plain clothes on Pennsylvania Avenue, in the vicinity of Sutter and Belmont Avenues, with his partner detective, then officer, Vitale, when they received a ShotSpotter notification for the vicinity of Glenmore Avenue and Georgia Avenue (Dec. Tr. at 5-6, 34, 36-39). After receiving the notification, the detective, who was "only two or three blocks away" from the area pinpointed by the ShotSpotter, "continued northbound on Pennsylvania Avenue" and then made a left and "found a male who was shot in the stomach" (Dec. Tr. at 7). The male was "doubled over, bent over at the waist . . . holding his stomach" (Dec. Tr. at 7). The detective later learned that individual's name was Mr. Reino-Lema (hereinafter "the complainant") (Dec. Tr. at 7). Detective Gerardi "briefly spoke" to the complainant, [*3]"immediately called for an ambulance over the radio," and then "conducted a quick field interview" of the complainant (Dec. Tr. at 7). According to the detective, the complainant told him that "he was walking and that he was approached by a male who demanded property from him," that the male then took the complainant's cellphone from his hand, that the complainant "fought back and gave some resistance at which time he heard a gunshot and then realized that he was shot in the stomach" (Dec. Tr. at 8). The complainant described his assailant as "a black male wearing all blue" (Dec. Tr. at 8). Within approximately five minutes, an ambulance arrived and transported the complainant to the hospital (Dec. Tr. at 9).
The detective then had an opportunity to interview another individual on the scene: Mr. Reyes. Mr. Reyes said that he was standing outside of a mechanic shop "almost at the corner of Sheffield Avenue and Glenmore" when "he heard a gunshot and after he heard a gunshot . . . he had seen the victim . . . standing on the corner of Glenmore and Georgia Avenue, and then saw a male in all blue" specifically, a "blue tracksuit" "running away from that location" (Dec. Tr. at 9-10, 41-43; Feb. Tr.[FN3]
at 8-9). The detective "immediately relayed that information over the radio" (Dec. Tr. at 10-11). Approximately five minutes later, Detective Gerardi learned over the radio that 73 Detective Squad members were "in pursuit of a male black in all blue" and that an individual who fit the description was stopped in regard to the shooting incident (Dec. Tr. at 11, 12, 17; Feb. Tr. at 11-13).
Mr. Reyes, and a second witness, Mr. Mensah, were then put into two separate, unmarked NYPD vehicles and driven approximately eight to ten blocks away to the vicinity of East New York Avenue and Sackman Street, where officers had the defendant [FN4]
stopped to conduct a showup identification procedure (Dec. Tr. at 12-14, 16; Feb. Tr. at 14). Detective Gerardi transported Mr. Mensah along with Detective Morales, and sergeant, then detective, Colombini (Dec. Tr. at 13, 21). According to Detective Gerardi, there was no conversation in the vehicle with Mr. Mensah other than "we have somebody stopped and we're going to conduct an I.D. procedure" (Dec. Tr. at 14). Detective Gerardi indicated that there was anywhere from six to ten officers with the defendant who was handcuffed behind his back (Feb. Tr. at 18, 21-22). The defendant was not wearing a mask or a hood (Feb. Tr. at 33). The detective further indicated that the windows of his vehicle were clear, not tinted, and it was daylight out (Feb. Tr. at 32). With the defendant approximately ten to 15 feet away from the vehicle, on the sidewalk, Mr. Mensah stated "that that was him, alluding to the fact that the individual that was standing on the sidewalk was the one that he had seen do the shooting," stating something to the effect of "that's him, that's the guy" (Dec. Tr. at 14; Feb. Tr. at 20-22, 34).
Back at the precinct, Detective Gerardi, met with the defendant in an interview room, where he read him his Miranda rights (Feb. Tr. at 29). After each question, the detective asked the defendant "do you understand" and the defendant responded, "yes" and then agreed to speak to the detective (Dec. Tr. at 17-19; Feb. Tr. at 30-31). In sum and substance, the defendant stated that:
"he was falling on hard times or times were tough with COVID and with the way things [*4]were going in the world. You know, times were tough and things were hard for him now and he needed . . . he needed money or just didn't really have a lot, and . . . that he has to basically rob or he had . . . needed these things to get by, to get himself back on his feet . . . that he let one go or he shot one in the air . . . didn't mean to shoot him" (Dec. Tr. at 18).
This statement was captured on video and was entered into evidence as People's Exhibit 2 (see People's Exhibit 2 — Debrief Video).

On January 8, 2021, Detective Gerardi prepared a photo array using the program, "Photo Manager" (Dec. Tr. at 22-24, 26, 28, 34; see People's Exhibit 3 — Photo Array). The detective explained how they are able to "plug in a description [of the defendant] as far as race, age, height, weight, facial hair" among other characteristics and find photos of individuals with those same characteristics (Dec. Tr. at 23). That photo array packet, which included the actual photo array, the results pages, and the post photo array form, was then provided to Detective Veliz for administration to the witness (Dec. Tr. at 24, 29). Detective Veliz did not know anything about the case and was selected in part because he spoke Spanish and the complainant felt more comfortable communicating in his native language of Spanish (Dec. Tr. at 24-25). After the photo array was shown to the complainant, the complainant identified "Number 2," the defendant, as the perpetrator (Dec. Tr. at 34).
C. Detective Jay Rivera
Detective Jay Rivera has been with the NYPD for over 19 years and is currently assigned to the 73 Precinct Detective Squad (Dec. Tr.[FN5]
at 22). The detective's responsibilities include: handling "investigative matters, homicides, shootings, robberies, larcenies" (Feb. Tr. at 37).
On November 22, 2022, detective, then investigator, Rivera, who was in plain clothes, was working with his partner, Detective Brett Woodard (Feb. Tr. at 37, 41). At approximately 1:20 PM he heard "a radio communication of a person being shot in the confines of the 75 Precinct," about four to five blocks away, in the vicinity of Glenmore Avenue and Alabama Avenue, in East New York, Brooklyn (Feb. Tr. at 38, 49). The communication included a description of "a male black, short, with blue clothing, blue jacket, blue pants" (Feb. Tr. at 38-39, 50, 67). The detective asked for clarification and learned that it was specifically a blue sweatsuit and not blue denim (Feb. Tr. at 67).
A "couple of minutes" later, the detective observed an "individual walking from the south side of East New York Avenue to the north side, crossing the street, on Junius Street" (Feb. Tr. at 39-40, 50). The individual was short, black, and wearing a blue sweatsuit, and "seemed like he was out of breath" (Feb. Tr. at 39-40). At the hearing, the detective identified the individual he observed on the street as the defendant (Feb. Tr. at 42). The defendant "walked to the north side of the street, onto Pacific, at a bus stop, and he stopped," so the detectives made a U-turn and approached him (Feb. Tr. at 40). Detective Rivera "opened the window to engage him" and the defendant took off running (Feb. Tr. at 40-41, 51). In response, Detective Rivera exited his vehicle and pursued the defendant on foot (Feb. Tr. at 41, 48, 49). The detective "chased him westbound on Pacific, approaching Sackman Street" and the individual then "turned right, going north" (Feb. Tr. at 41, 52). The detective followed and observed the defendant turn around, go into his waistband, take out a gun and throw it over a fence into a construction site [*5](Feb. Tr. at 41-43, 52-53). The defendant then "ran another 10 feet or so, and he just stopped" and was then handcuffed (Feb. Tr. at 41-43, 52, 55). The detectives radioed for assistance and indicated that they "had the person stopped with the same description" (Feb. Tr. at 43, 63).
Once the defendant was apprehended, Detective Rivera had the defendant wait on the sidewalk for the showup to be conducted (Feb. Tr. at 44). There were five officers within five to 10 feet of the defendant, the defendant was handcuffed and he was not wearing a mask or a hood on his head (Feb. Tr. at 44, 46, 58). According to the detective, two vehicles drove by: the first was an unmarked black Impala with untinted windows and the investigator in the vehicle gave Detective Rivera a thumbs up, which indicated a positive showup (Feb. Tr. at 45, 63-65). Next, was an unmarked silver Charger with tinted windows, and from that vehicle Detective Gerardi gave a thumbs up, again indicating a positive showup (Feb. Tr. at 45-46, 63-65). Detective Rivera clarified that even before the showups were conducted, the defendant "was going to be under arrest anyway, even if he wasn't the guy that did the shooting" because "he threw a gun" (Feb. Tr. at 47). 
After the defendant was transported by another officer to the precinct, Detective Rivera entered the construction site where he had witnessed the defendant throw the firearm (Feb. Tr. at 47). He was able to have the onsite security officer open the gate for them (Feb. Tr. at 55-56). Once inside the construction site, he observed the firearm, a black semiautomatic pistol, on the ground, unobstructed (Feb. Tr. at 47, 60, 68). The firearm was vouchered by the Evidence Collection Team (hereinafter "ECT") and sent to the lab (Feb. Tr. at 48).
D. Detective Omar Veliz
Detective Omar Veliz has been with the NYPD for over 21 years and is currently assigned to the 75 Precinct Detective Squad (Apr. Tr.[FN6]
at 4). The detective's general duties and responsibilities include: investigating complaints, conducting interviews, photo arrays and lineups (Apr. Tr. at 4).
On January 8, 2021, Detective Veliz was asked by Detective Gerardi to "perform a double-blind photo array" (Apr. Tr. at 5-6). Detective Gerardi provided Detective Veliz with a manila folder containing "[t]he photo array previewing instructions to witness report, the photo array viewing report, and the actual photo array with six individuals on them" but did not discuss the charges or any other details about the case (Apr. Tr. at 6-7, 17). The detective then met with the complainant in an interview room and read the photo array instructions to him in Spanish (Apr. Tr. at 8). He provided the complainant with an envelope containing the photo array, which the complainant opened and viewed (Apr. Tr. at 11, 19). The complainant then verbally identified "Number two," "circled it and signed his name underneath the photograph" and wrote his confidence statement (Apr. Tr. at 11-12, 20-21, 23). The detective then exited the interview room and handed the photo array back to Detective Gerardi (Apr. Tr. at 13). Other than administering the photo array, Detective Veliz had no involvement with the case and had never met the defendant (Apr. Tr. at 7, 13).

 II. CONCLUSIONS OF LAW

On a motion to suppress evidence, the prosecution has the initial burden of going forward to demonstrate the legality of the police actions and must introduce credible evidence to meet this burden (see People v. Berrios, 28 NY2d 361, 369 [1971]; see People v. Hernandez, 40 [*6]AD3d 777 [2d Dept, 2007]).
A. Dunaway
For the Dunaway portion of this hearing, the initial burden of proof rests with the People to put forward credible evidence tending to show that law enforcement acted lawfully. The defendant has the burden of proving by a preponderance of the evidence that the police acted unlawfully (see People v. Baldwin, 25 NY2d 66 [1969]; see People v. Parker, 180 AD3d 1072 [2d Dept, 2020]). The Court must determine whether the police action was "justified at its inception and whether it was reasonably related in scope to the circumstances which justified the interference in the first place" (People v. Wheeler, 2 NY3d 370, 374 [2004]).
To assess the propriety of a street encounter with police, the Court must employ the four-tiered framework set forth in People v. DeBour (40 NY2d 210 [1976]) and reaffirmed in People v. Hollman (79 NY2d 181 [1992]). Each progressive level under this framework "authorizes a separate degree of police interference with the liberty of the person approached and consequently requires escalating suspicion on the part of the investigating officer" (id. at 185). "The justification for each escalation is based on the totality of the circumstances at the moment the escalation occurs, building on the officer's prior observations and actions of both the officer and the private individual" (People v. Johnson, 40 NY3d 172, 179 [2023]).
Level One — Request for Information: Law enforcement may engage in minimally intrusive questioning to request information "when there is some objective credible reason for that interference not necessarily indicative of criminality" (DeBour, 40 NY2d at 223). The request for information cannot be based on conduct that is otherwise innocent and "must be predicated on more than a hunch, whim, caprice or idle curiosity" (People v. Ocasio, 85 NY2d 982, 985 [1995]). A level one request for information must be limited to "basic, non-threatening questions" regarding, for example, address, destination, or identity (People v. Kennebrew, 106 AD3d 1107, 1109 [2d Dept, 2013]). An individual does have the right to walk away without responding (see People v. Howard, 50 NY2d 583 [1980]).
Level Two — Common Law Right of Inquiry: Law enforcement is permitted "to gain explanatory information . . . short of forcible seizures" upon a "founded suspicion that criminal activity is afoot" (DeBour, 40 NY2d at 223). A level two intrusion would involve more pointed questions that would reasonably lead the person approached to believe that they are suspected of some wrongdoing (Kennebrew, 106 AD3d at 1109).
Level Three — Reasonable Suspicion: Permits "a forcible stop and detention" but requires the officer to have "a reasonable suspicion that a particular person has committed, is committing or is about to commit a felony or misdemeanor" (DeBour, 40 NY2d at 223). Reasonable suspicion is defined as the "quantum of knowledge sufficient to induce an ordinarily prudent and cautious person under the circumstances to believe criminal activity is at hand" (People v. Martinez, 80 NY2d 444 [1992], citing People v. Cantor, 36 NY2d 106 [1975]). However, "innocuous behavior alone will not generate a founded suspicion that a crime is at hand" (Kennebrew, 106 AD3d at 1109; see People v. Brannon, 16 NY3d 596, 602[2011] ("reasonable suspicion requires specific and articulable facts which, along with any logical deductions, reasonably prompted the intrusion" [emphasis added])). An effect of this right to temporarily detain is the "authority to frisk if the officer reasonably suspects that [he is] in danger of physical injury by virtue of the detainee being armed" (DeBour, 40 NY2d at 223; see People v. Carney, 58 NY2d 51 [1982] (a police officer with knowledge of facts indicating that the individual is armed or dangerous may frisk a suspect)). 
Level Four — Reasonable Cause: Law enforcement may arrest and take a person into custody when that officer "has reasonable cause to believe that person has committed a crime, or offense in [the officer's] presence" (id.).
The defendant argues that the People failed to meet their burden because they "relied on Detective Gerardi to . . . establish probable cause for Detective Rivera to seize defendant" (Defense Motion at § II).[FN7]
The Court disagrees.
"Under the fellow officer rule, a police officer can make a lawful arrest even without personal knowledge sufficient to establish probable cause, so long as the officer is acting 'upon the direction of or as a result of communication with' a fellow officer ... in possession of information sufficient to constitute probable cause for the arrest" (People v. Ketcham, 93 NY2d 416, 419 [1999], quoting People v. Mims, 88 NY2d 99, 113[1996]). Probable cause exists when "an officer has knowledge of facts and circumstances sufficient to support a reasonable belief that an offense has been or is being committed" (People v. Maldonado, 86 NY2d 631, 635 [1995] [internal quotation marks omitted]). At a suppression hearing, the prosecution has the burden of establishing that the officer who transmitted the information had probable cause (see Ketcham, supra).
To assess whether hearsay information is sufficient to establish probable cause for a warrantless arrest, the Court must apply the two-prong Aguilar—Spinelli test: "(i) the veracity or reliability of the source of the information, and (ii) the basis of the informant's knowledge" (People v. Griminger, 71 NY2d 635 [1998]; see Aguilar v. State of Texas, 378 US 108 [1964]; see Spinelli v. US, 393 US 410 [1969]). Under the fellow officer rule, "[i]nformation received from another police officer is presumptively reliable" (Ketcham at 420). The People still, however, must satisfy the second prong of the Aguilar—Spinelli test: how the transmitting officer acquired that information.
Here, Detective Gerardi met and spoke with the complainant and one of the witnesses, Mr. Reyes. Both the complainant and Mr. Reyes provided similar descriptions of the assailant: a black male in blue clothes. Detective Vitale was also provided the same description from the witness he interviewed, Mr. Mensah. Detective Gerardi then relayed the information via radio to the other units. Within minutes of that description going over the radio, Detective Rivera observed an individual matching the description. He put in a call asking for clarification and confirmed his own suspicion that the individual he was seeing approximately ten blocks away from the incident matched the description. Based on the information Detective Rivera was provided, he had reasonable suspicion to believe that the defendant had committed the shooting and was therefore justified in making a forcible detention pending a show up identification (see People v. Ramos, 74 AD3d 991 [2d Dept, 2010]). 
Once the defendant was lawfully detained, Mr. Mensah's show up identification of him as the perpetrator of the earlier shooting, discussed infra, gave rise to probable cause. Of course, "[p]robable cause does not require proof to a mathematical certainty, or proof beyond a reasonable doubt" (People v. Mercado, 68 NY2d 874, 877 [1986]). Rather, it must be "more probable than not that a crime has taken place and that the one arrested is its perpetrator" (People v. Carrasquillo, 54 NY2d 248, 254 [1981]). It is well-settled that information provided by an [*7]identified citizen is sufficient in and of itself to provide a police officer with probable cause (see People v. Williams, 301 AD2d 543 [2d Dept, 2003]("information provided by an identified citizen accusing another individual of the commission of a specific crime is sufficient to provide the police with probable cause to arrest"); see People v. James, 166 AD3d 1011, 1012 [2d Dept, 2018] ("Generally, a police officer has reasonable suspicion to stop and detain an individual where the individual matches the description of a perpetrator's appearance and is located close to the crime scene, both temporally and geographically"); see People v. McClain, 67 AD3d [4th Dept, 2009](information provided by an identified citizen, accusing another of a specific crime, is sufficient to provide the police with probable cause to arrest)).Thus, the People have met their burden of demonstrating that the police possessed probable cause to arrest the defendant with respect to the shooting incident.
Moreover, during the detective's lawful pursuit of the defendant, he observed the defendant remove a firearm from his person and throw it over the fence. This observation provided the detective with probable cause to arrest the defendant for possession of the firearm.
B. Mapp
The defendant's abandonment of the gun was not precipitated by illegal police conduct, but rather, was "an independent act involving a calculated risk attenuated from the underlying police conduct" (People v. McCullough, 31 AD3d 812 [3rd Dept, 2006]; People v. Boodle, 47 NY2d 398 [1979]). The throwing of the gun, "flowed from defendant's refusal to accede to a reasonable police request" (People v. Berry, 87 AD2d 53, 57 [1st Dept, 1982]). Although everything happened quickly, the defendant had enough time to reflect and calculate the risk of ridding himself of the firearm (Boodle, 47 NY2d at 404). Therefore, the defendant lacks standing to challenge its recovery (see People v. Martinez, 80 NY2d 444 [1992]). In any case, the weapon was properly searched for and recovered based on the detective's observations. There was no police conduct that could be interpreted as an unreasonable governmental intrusion (see People v. Morales, 197 AD2d 710 [2d Dept, 1993]).
C. Wade
Unduly suggestive pretrial identification procedures violate due process and therefore are not admissible to determine the guilt or innocence of the accused (see United States v. Wade, 388 US 218 [1967]; see People v. Chipp, 75 NY2d 327 [1990]). The purpose of a Wade hearing is "to test identification testimony for taint arising from official suggestion during police-arranged confrontations between a defendant and an eye-witness" (People v. Dixon, 85 NY2d 218 [1995]). An identification procedure is "police-arranged" if it occurs at the "deliberate direction of the State" (id. at 223).
The initial burden of going forward to establish the reasonableness of the police conduct and the lack of any undue suggestiveness in a pretrial identification procedure rests with the People (see Chipp at 335). However, the defendant bears the ultimate burden of proving that the identification procedure was unduly suggestive (id.). Where the court deems a procedure to be unduly suggestive, the prosecution then has the burden to establish, by clear and convincing evidence, that there is an "independent source" for an in-court identification at trial (id.).
i. Showup
The People provided notice of a showup identification procedure, specifically the identification made by Mr. Mensah, discussed supra (see CPL 710.30[1][b] notice; see Notice [*8]and Disclosure Form).[FN8]
The defendant argues that the People failed to meet their initial burden and that procedure was unduly suggestive and tainted. The defendant moves to suppress the identification.
Showup identifications are inherently suggestive, and only "permissible if exigent circumstances require immediate identification or if the suspects are located at or near the crime scene and can be viewed by the witness immediately" (People v. Brisco, 99 NY2d 596, 599 [2003] [internal citations and quotation marks omitted]). A showup must be examined to determine if it was conducted as part of an "unbroken chain of events" or part of an ongoing investigation (People v. Duuvon, 77 NY2d 541, 544-45 [1991] (showup found permissible because it was "one unbroken chain of events-crime, escape, pursuit, apprehension and identifications-all within minutes and within a New York City block and a half")). The identification must also be made in close geographic and temporal proximity to the crime (see People v. Ortiz, 90 NY2d 533, 537 [1997]).
In the instant case, the People have demonstrated that the showup was conducted within close geographic and temporal proximity to the location of the crime. The time that elapsed between the incident and the showup was less than 20 minutes (see Brisco at 597 (showup procedure conducted at scene of crime, within an hour of crime and in context of continuous, ongoing investigation found reasonable); People v. Jerry, 126 AD3d 1001 [2nd Dept, 2015] (showup conducted within 40 minutes of the crime was permissible)). The location of the showup was approximately ten blocks from the scene (see People v. Greene, 39 AD3d 268 [1st Dept, 2007] (showup conducted two miles from the scene of the crime was permissible given that the perpetrator fled the scene by train and the identification took place at the location of the arrest)).
The People must also offer "some evidence relating to the showup itself, in order to demonstrate that the procedure was not unduly suggestive" (Ortiz, 90 NY2d at 537). This second element of the People's burden may be met through the testimony of an officer who transported the complainant to the location of the showup and who can provide a detailed account of the circumstances of the procedure (see People v. Mack, 135 AD3d 962 [2nd Dept, 2016] (People met their burden by providing the testimony of one detective, who both transported the complainant to the showup and was able to provide a detailed description of the showup procedure)). Here, the People met their burden through the testimony of Detective Gerardi who transported the witness to the showup and provided a detailed account of the physical circumstances of the procedure.
The defendant then failed to meet the ultimate burden of proving that the showup procedure was unduly suggestive and should be suppressed. Contrary to the defendant's argument, the showup was not unduly suggestive merely because he was handcuffed and surrounded by uniformed police officers and police cars (see People v. Gonzalez, 57 AD3d 560 [2d Dept, 2008]; People v. Charles, 110 AD3d 1094 [2d Dept, 2013]; People v. Jerry, 126 AD3d 1001[2d Dept, 2015]).
ii. Photo Array
The People also provided notice of a photo array identification procedure (see Notice and Disclosure Form). The defendant does not address this photo array in the written arguments submitted to the Court.
The testimony at the hearing and the photographs entered in evidence demonstrate that the fillers sufficiently resembled the defendant, and that no characteristic would influence the viewer toward choosing the defendant: they had similar skin tone, hair color and age (see People v. Howard, 50 AD3d 823 [2d Dept, 2008]; see People's Exhibit 3).
In addition, the photo array was administered in a double-blind procedure in accordance with CPL § 60.25(1)(c). Here, the photo array was prepared by and administered by a different detective. The detective administering the photograph array had no knowledge of the subject of the array or what position in the array the subject was. Moreover, there was no evidence that the detective made any comments to the witness, other than to properly instruct him on the procedure (see People v. Devonish, 165AD2d 723 [1st Dept, 1990]; see also People v. Flowers, 150 AD2d 721, 721 [2d Dept, 1989]("The defendant's speculation as to what may have occurred during the lineup procedure is insufficient to sustain his burden of proof that the procedure was suggestive, since such claims are not supported by the hearing record")).
The totality of these factors shows that there is no aspect about the photo array that would cause the defendant to be "singled out for identification" (People v. McBride, 14 NY3d 440, 448 (2010); People v. Bell, 188 AD3d 904, 905 (2nd Dept, 2020); People v. Richardson, 200 AD3d 984, 985 (2nd Dept, 2021)). Moreover, the Court's independent viewing shows that the photograph array does not suggest that any one of the photographs is more likely to be selected.
The defendant has failed to meet his burden of showing that the photo array identification procedure was unduly suggestive. Therefore, the defendant's motion to suppress it is denied.
D. Huntley
The People provided notice of several statements made by the defendant to law enforcement personnel that they planned on using in their direct case (see CPL § 710.30[1][a]): (1) a statement at the hospital to Officer Turton, and (2) a statement at the 75 Precinct to Detective Gerardi (see People's Notice and Disclosure Forms).
A statement made by a defendant may not be used against him during a criminal trial unless it is proven beyond a reasonable doubt that the statement was voluntarily made (see CPL § 60.45[1]; see People v. Grillo, 176 AD2d 346 [2d Dept 1991], citing People v. Huntley, 15 NY2d 72 [1965]). A statement is deemed to be "involuntary" if it was coerced by the use or threatened use of physical force, or improper conduct or undue pressure "which impaired the defendant's physical or mental condition to the extent of undermining his ability to make a choice whether or not to make a statement" (CPL § 60.45[2][a]). In a challenge to the voluntariness of a statement, the court must examine the totality of the circumstances under which the statement is made, including the characteristics of the accused and the circumstances [*9]under which the statement was made, including: the duration and conditions of the detention, the age, physical state and mental state of the defendant, and whether the defendant was provided food, water, bathroom breaks (see People v. Guilford, 21 NY3d 205, 208 [2013]; see People v. Sakadinsky, 239 AD2d 443 [2d Dept, 1997]; see People v. Brown, 113 AD3d 785 [2d Dept, 2014]; see People v. Hall, 145 AD3d 915 [2d Dept, 2016]; see People v. Johnson, 139 AD3d 967 [2d Dept, 2016]).
A statement obtained by law enforcement may also be deemed involuntary if obtained by certain improper promises or statements of fact, or in violation of the State or Federal constitution (CPL § 60.45(2)(b)(i) and (ii)). One of those constitutional rights, the privilege against self-incrimination, is protected by the Miranda rule (see People v. Berg, 92 NY2d 701 [1999]). "Because the privilege applies only when an accused is 'compelled' to testify, the safeguards required by Miranda are not triggered unless a suspect is subject to 'custodial interrogation'" (Berg, at 704). "Both the elements of police 'custody' and police 'interrogation' must be present before law enforcement officials constitutionally are obligated to provide the procedural safeguards imposed upon them by Miranda" (People v. Huffman, 41 NY2d 29, 33 [1976]). A suspect is in custody if in that same situation, a reasonable person innocent of any wrongdoing would have believed that he or she was not free to leave (see People v. Harris, 48 NY2d 208, 215 [1979]; People v. Yukl, 25 NY2d 585, 589 [1969]). "The term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response" (People v. Ferro, 63 NY2d 316, 322 [1984], quoting Rhode Island v. Innis, 446 US 291, 301 [1980]).
i. Statement at the Hospital
The evidence at the hearing established that the statements at the hospital were made shortly after the officer arrived. While the defendant was in custody, and there is no evidence to suggest that the officer attempted to elicit incriminating statements from him, whether by direct questions or by his conduct. The statements made by the defendant were spontaneous in nature. The Court finds that the People have proven beyond a reasonable doubt that the defendant's statements at the hospital were not produced by threats, coercion, or any other inducement and were, therefore, voluntary (People v. Witherspoon, 66 NY2d 973, 974 [1985]; see also CPL § 60.45[1]).
Therefore, the motion to suppress the statements at the hospital is denied.
ii. Statements at the Precinct
As to the notice statement at the precinct, the defendant was undoubtedly subject to custodial interrogation by detectives during the debriefing. The evidence at the hearing established that the defendant was given Miranda warnings while in the interview room. He acknowledged his understanding of his rights by answering each question in the affirmative without hesitation. Here, the defendant was not promised anything, threatened or coerced, or handcuffed, and his responses demonstrate a clear understanding of the circumstances.
Accordingly, the Court finds that the People have proven beyond a reasonable doubt that the defendant's statements were made after he knowingly, intelligently, and voluntarily waived his Miranda rights, and the motion to suppress the defendant's statement is denied. 
This constitutes the Decision and Order of the Court.
Dated: August 1, 2024
Kings County, New York
Hon. Claudia Daniels-DePeyster, A.J.S.C

Footnotes

Footnote 1:Refers to August 23, 2022, transcript.

Footnote 2:Refers to December 1, 2023, transcript.

Footnote 3:Refers to February 23, 2024, transcript.

Footnote 4:During the hearing, Detective Gerardi identified the individual stopped by the members of the 73 Detective Squad as the defendant (Dec. Tr. at 15).

Footnote 5:Refers to December 1, 2023, transcript.

Footnote 6:Refers to April 10, 2024, transcript.

Footnote 7:As the defense motion does not contain any page numbers or paragraph numbers, the Court is only able to refer to the general sections marked by Roman numerals when citing to the motion.

Footnote 8:Initially, the People served notice of a second showup identification procedure, specifically that of Mr. Reyes. However, on February 23, 2024, the People withdrew that notice and stated that the identification was a "clothing ID" wherein the witness essentially identified "that's what the guy was wearing" rather than "that is the guy" (Feb. Tr. at 14-25). In response, the defendant asks this court to preclude Detective Vitale from testifying to "anything regarding his interviewing witnesses of the shooting prior to the show up procedures" (Defense Motion at § I). The Court sees no basis to grant this request. While the Court does foresee the possibility of hearsay testimony being elicited from Detective Vitale regarding this line of questioning, that is to be seen and the decision of whether to allow such testimony as an exception to the hearsay rule is to be determined by the trial judge.